Mr. Gordon, you're up first. You've got ten minutes, but you've reserved three minutes for rebuttal, so that gives you seven to start. Thank you. May it please the court. The case before the court this morning is a Social Security case involving a psychiatric disability. One of the things that's really important in the case is that it's what's called a supplemental security income, I'm going to call it SSI case, in which the judge can only determine the period from the filing of the of the case, which in this case was 2-5-20 until the decision, and realistically the decision was 3-4-21, so that's 13 months. Realistically, just like the argument today is heard and then the decision will come out later, the argument was 2-19-21, so it's 12 months, and the reason I emphasize that is because the primary argument we have is that for that period it is very obvious that the claimant could not work consistently. The judge made a finding essentially that the claimant could do simple work, occasionally interacting with others. He brought in what's called a vocational expert, very properly, who said no jobs would remain if either the person was off task up to a certain percent, absent one day a month. What is obvious in this case, and the judge found no diminishment of ability to work consistently, what is obvious, just without anything else, is that the absenteeism and the off task is clearly shown. Twice to the psychiatric, now this is in the middle of COVID, by the way, when it's next to impossible to get to the hospital and when you go there you sit for hours. One time to the emergency room, they wouldn't admit him at that time because he was sent back again to the site, it's called CPAP in Binghamton, comprehensive psychiatric, in any event, back to the emergency room a second time a month later or two months later. Both of these, by the way, are happening after the commissioner's consultative exam and their non-examiners review of the records, and now he's admitted for 10 days. That alone, and that's assuming that somebody goes for a psychiatric exam, for psychiatric hospitalization, they're 100% fine the day before and then they're not. That's not the way it works. The way it works is you're bad, you're bad, you're bad, finally, especially during COVID. But by this logic then, anybody who's hospitalized during a period like that has to be found. No, absolutely not. There is so much, there is so much else in this case. Certainly somebody who is, if you had a three-year period and the person is hospitalized 36 days during a three-year period, three times, yeah, that would go a long ways towards showing it. It certainly shows that he can't work consistently with no absenteeism, but you have so much more. You have the fact that- Is there evidence of absenteeism, is there evidence of absenteeism other than by a hospitalization? Absolutely, and that's just what I'm getting to, is on top of that, and on top of that, here's all the other things. He stays at his house, he gets out one day a week, he sleeps 12 to 13 hours a day, he has panic attacks where he curls up in a ball and blacks out. He has these panic attacks, they're talked about in the medical record several times, sometimes it's two times a week, sometimes it's three, sometimes it's four, either way. He's a photographer. He's a photographer. Does he do commercial photographic work? No. He goes out, and most of this is before the hospitalizations, but he will go out the once a week, again, he has to be able to work consistently. He'll go out once a week and take pictures of birds or flowers or whatever he will. That's once a week, and all of that is, again, before the hospitalizations, before any of that, but going out once a week is hardly working five days a week, eight hours a day. Even the administrative law judge noted, this is page 26, that the conditions wax and wane. That in and of itself says that sometimes he can, sometimes he can't. There has to be some diminishment of the ability to work consistently. Is there a finding as to whether he could work from home? Well, that's not a job. Most people are working from home. Right, but that's not a job. People here. That's why they, well, you got sedentary simple here, which is called, in other words, that's the least type of job and the least and simplest. So, you have somebody here who doesn't- You have somebody who doesn't have our skills, who can work in a factory in a simple job, and the judge says he's limited to simple work. So he's limited to simple work, and the vocational experts specifically testified as to the sedentary simple jobs that were available, and that's not an issue here. The point being that all of those jobs are, they're jobs outside for somebody of this capacity.  And the vocational expert said, did not say that there were any jobs at home. I understand that for me, in fact, I'm blessed. I'm in Florida for half the time, and I work from home 40 hours a week, but not for a person like this. He has no capacity, and nor was it even mentioned anywhere in this transcript that that would be a possibility. In terms of the opinions, we do note every opinion says that there would be inability to work consistently. Now, both the commissioners examining consultant, again, middle of COVID, did it. Not in person, as this court wasn't even open, but rather did it on a video, which is as good as they could do. And the non-examiner said there would be diminishment to work consistently before all the conditions got worse, twice to the emergency. He walks to a bridge and contemplates jumping off. And the only reason he hasn't done it, hasn't acted upon his plan, is that he has other people, or he's just not, I don't want to say courageous, that would be the wrong word. His medications got increased three times, two new medications added. I was taken by the commissioner and the administrative law judges note that he- But again, the ALJ did acknowledge that he had this hospitalization, but that he responded positively to treatment, right? And we set forth that he did not. After the treatment, he did not have to be hospitalized, but he went out once a week. He, his medications were twice, two new ones, twice they were increased, the ones he had. They discontinued one because of the side effects. The panic attacks increased from two a week to four a week, he curls in a ball and cries. His condition stabilized to the point, it's like saying you're in the hospital and you're completely comatose, and then you come out of the comatose and you're allowed home, but you can't walk. Yes, he's stable, he's stable, but not able to work. And that is just an incredible difference. That's an ocean of difference. All right. Thank you. Three minutes for rebuttal, Mr. Gordon. We'll now hear from Ms. Atin. How do you pronounce that? I must be messing it up. Olgin. What's that? Olgin. Olgin. Yes. I'm not even close. That's fine. All right, Ms. Olgin, you may proceed. Right. May it please the court. Substantial evidence supports the ALJ's finding that Mr. Porteus could perform a limited range of unskilled work, where he would only need to concentrate on simple and routine tasks with no more than ordinary changes and no more than occasional interaction with co-workers, supervisors, or the public. The ALJ based this finding on the entire record and adequately accounted for Mr. Porteus's reported difficulties dealing with stress, social interactions. Slow down a little bit. I'm having a little trouble following. Sorry. So the ALJ accounted for his reported difficulties dealing with stress, social interactions, and staying on task. The ALJ based the RFC in part on Mr. Porteus's own statements. He reported having a low stress threshold, and he said that in prior jobs he had performance anxiety and he worried constantly about making mistakes. So the ALJ found that he couldn't do his past relevant work, which was semi-skilled, and instead limited him to a narrow range of simple, routine, unskilled work. The ALJ also recognized that social limitations were a source of stress. Mr. Porteus reported difficulties leaving the house and maintaining close relationships. So the ALJ limited him to no more than occasional interaction with others. And the ALJ explained- No more than occasional what? Interactions with others. Yes. But these jobs are janitorial and housekeeping? Yes. So you can't do that from home? No, that's- So you have to come in, and there's evidence to suggest that he may not be able to come in every day. He may be out a certain number of days a month. And he may not be on the job mentally for a certain part of the day. So the question of working from home was not specifically explored in this case? No, we know he can't work from home, but he does have to be there, doesn't he? Yes, he would have to go into the job, but the evidence doesn't specifically indicate that he would, there's no evidence in a vacuum indicating that he would be off task in particular. That was, the ALJ found that that was specifically in response to these stressors, one of which was interacting with others. So the ALJ limited that, and by including these specific- So he goes off task when he interacts with other people? That's one of the- And so if he has a job in which he doesn't interact with other people, that would diminish the likelihood that he would go off task? It would diminish the likelihood, yes. But then if he doesn't come in, it can't be because he's interacting with other people. If he can't, here's the issue, if he can't come in two, three times a month, who would hire him? Would you? Well, the ALJ was not required to find that he would not come in any particular number of days a month. That's not- There was no finding that he wouldn't come in particular days a month, was there? No, and there wasn't required to be, because there are a number of ways that the ALJ could account for difficulties in this area. And in this case, the ALJ accounted for them by, again, by limiting the conditions of work. And this is, I mean, in this case, there is evidence indicating that his difficulties with staying on task were specifically- Well, they were mild to moderate were the limitations, right? That's, so- According to Dr. Carr. There were mild to moderate limitations in maintaining a schedule. And then according to Dr. Common, there were moderate limitations in continuing work without interruptions from psychologically based symptoms. But Dr. Common still found that despite this, he could perform unskilled work. Right, and the ALJ basically said, yeah, there's certain types of unskilled work that could be done. The RFC was consistent with that. Yes, but a limited range of unskilled work. And this is, the finding that he could perform this work consistently with appropriate limitations is supported by the treatment records, which really show that he did have sometimes more severe symptoms in response to particular stressors, but that overall, he could maintain a reasonable functional level. I'm just going through what the treatments show starting in February 2020. At that point, he was managing his anxiety fairly well. That continued through the spring of 2020. And yes, this was the beginning of COVID. He said he had some anxiety because of COVID, but he still said that he was managing his anxiety fairly well. He didn't need any changes in his medications. He was still leaving the house to see his girlfriend, to see other friends. His providers agreed that he didn't need any medication changes. And he said, as up through June 2020, he said that he was managing his anxiety well. His symptoms did deteriorate later that summer, but that was only after a number of significant stressful developments. That was after not only just COVID, but also his girlfriend broke up with him. His roommate was fighting with him and his roommate threatened to evict him because the roommate was concerned he was leaving the house too much, not social distancing enough. And then he was concerned about becoming homeless in the middle of the pandemic. So that's when he went to the hospital. And just to clarify one point about the hospital, about the visits to the hospital. When he went in July, the reason he was not admitted then, it's not that they wouldn't admit him. He did not meet the standards for involuntary admission and he declined voluntary admission. They determined he wasn't a threat to himself. He had a friend who agreed with that and they determined that he was safe to go home. There was additional stress later in August after he had a bigger fight with his roommate and then he was facing the possibility of homelessness coming up very soon. So then he was hospitalized for 10 days, but he quickly stabilized in the hospital. And it's not just that he improved, when we say that he improved later, it's not just that he was no longer actively suicidal and hospitalized. The attending physician said that he accomplished quite a lot in the hospital and that he made specific plans to address the stressors that brought him there, one of which was housing. And the subsequent treatment records do show that he did continue making plans to address that problem. He had to live in a shelter for the first few months afterward and that was still stressful. He still had some suicidal ideation. But with continued therapy and medication adjustments, he did report in November that there were some improvements. He was feeling less suicidal. And then in December, he did manage to get his own apartment. And he was excited about that. And that's the last treatment note in the record. And then throughout this period, his treating providers consistently found that he was not a danger to himself. And they found consistent, their mental status findings were consistently mostly benign throughout this period, including intact insight and judgment. In fact, future-oriented judgment. So this trajectory supports the ALJ's finding that even though Mr. Porteus's symptoms did wax and wane to some extent, he still maintained reasonable functional level and his impairments could be managed with treatment. So this RFC also accounts for the opinion evidence and for the reasons explained in pages 39 to 47 of the commissioner's brief, nothing in those opinions. As a vocational expert asked, what level of absenteeism would be tolerated in the kinds of jobs that that expert said he could do? The expert said that 15% was the threshold of time off task and one day a month was the absenteeism threshold. And he would keep the job despite that? Up to 15%, up to one day a month. He wouldn't be fired because somebody decided that he would. Inside of that, no, I think the implication was that anything more than that would preclude work. But there seems to be no finding as to whether he might be off task 25% of the time or might be absent three days a month. No, because that's not, that is, the vocational expert was asked that specific question, but that's not a specific functional limitation that the ALJ is required to address in every case. Well, but the question is, there's nothing in the record that indicates it was more than 15% or more than one day a month. Yes, exactly. I mean, sometimes we have that. Sometimes we have a situation where there's a treatment provider who says, look, I think this guy's going to have a tremendous difficulty getting in here. You know, he's going to miss half the time or he's going to miss five days a month. And then if there's a dispute among providers or, you know, consultants, then the ALJ has to weigh that and decide what's what. But here we don't even have that, right? Yes, that's correct. So the ALJ's decision was supported by the events. There was nothing before the ALJ that compelled that particular finding, and that was reasonable. The, so the upshot is that the ALJ reasonably did account for that evidence. There was, at most, the only evidence relating to that point was the opinion that was submitted to the Appeals Council, but for the reasons set forth in our brief and also in the district court's decision, it was reasonable to find that the ALJ's decision was still supported by substantial evidence, even notwithstanding that opinion. So for all these reasons, as well as those set forth in our brief, if the court has no further questions, we would rest on our brief. Thank you. All right. Thank you very much, Ms. Olgin. Okay, Mr. Gordon, back to you. Thank you. And I don't think I'll take anywhere close to three minutes. Well, you've got it, so, you know. I know. Can I ask a very simple question? Yes. It's called Supplemental Security Income Benefit, right? Supplemental to what? Does this mean you're already getting other types of- No, no. The Social Security law provides for two types of benefits. One is if you are a, if you have a sufficient work record, and that's what's called Title II Disability Benefits. The other is if you don't have a sufficient work record and you're destitute. You have to meet, you can't have $3,000 in the bank, you can't have any assets. Then I don't know why the commissioner called it Supplemental Security Income, but it has nothing to do with supplemental. It is just, it's glorified welfare. Glorified is what it is. And the difference in terms of what the judge looks at, here we had a whole bunch of records. He couldn't stay in school. He lost jobs. None of that related to the period of time. That's why I focused on the period of time. A couple things. First of all, with respect to both the examiner, Carr, and the non-examiner, who found up to moderate diminishment in ability to work consistently, that is June of 20, before any of the increased problems. Just imagine what they would find if they had a full record. The Rucker case, several other cases indicate that if the Rucker v. Commissioner, it's a published case, if the non-examiner and the examiner don't have the records, that means that their opinion is not right. But even without that, even without that, he finds up to moderate diminishment. To take up Your Honor's point just for a minute, the judge doesn't specifically say whether he would be off task for absenteeism, but he does by omission. He says he can do all these things consistently. That means that there is no diminishment. Did you put in evidence or give testimony? Oh, yes. That he would be off task more than 15% of the time? Absolutely. Or have to be out more than a day? Absolutely. He specifically testified. You know, I get panic attacks two to four times a week. I leave the house one time a week. When I get in a panic attack, I curl up and cry. And we have Ray's opinion that is set forth in our brief and in the transcript that says more than 15% and more than one day absence. The difference that, and so all of that is in there. Was that testimony rejected? Was that testimony rejected? Forgive me, Your Honor. Yes, I do. Was that testimony that you were referring to just now, was it rejected by the entire fact? In the sense that he said that he could work consistently in a simple job, occasional interaction with others, it was. He said he could work consistently in that job. So there is an implicit finding. Right. Rejecting that testimony. Correct. That is certainly what we think. And that was the case also in Rucker, in Colgan, which was a headache case, not a psych case. But in all of those, in fact, forgive me, I do maybe 200 or 300 of these a year before the ALJ. They never, they just say what the person can do and they just, they can't address it because if they address it, it's going to be error. They just simply don't address it. And they didn't address it in this case. And that was exactly what this court found in the published case of Rucker, is that you have clearly some off task, you have clearly some absenteeism,  Thank you, Your Honor. One other thing. Just, and forgive me. You told me you weren't going to use three minutes, Gordon. All right. Well, it was the commissioner's argument, both in the ALJ's decision and here, that somehow because at one point he said my medication shouldn't be increased and my functioning is better, that we should agree with that. And I take the analogy to the lawyer who represents himself as a fool for a client. What do we say about the psychiatric guy who stands on a bridge and wants to jump off about whether he can medicate himself. In fact, the medications got increased twice, which he had, and he got two new medications, and one was taken off because of the side effects. Thank you, Your Honor. Thank you. We will reserve decision.